FOURTH DISTRICT—MAY, 1915.          175

Belleville Savings Bank v. Mercantile Trust Co., 194 Ill. App. 175.

## Belleville Savings Bank et al., Appellees, v. Mercantile Trust Company, Trustee et al., Appellants.

## Mercantile Trust Company, Trustee et al., Appellants, v. Southern Coal & Mining Company et al., Appellees.

1. MORTGAGES, § 373*—*when mortgage may contain provisions governing foreclosure.* Holders of bonds secured by mortgage have a right to 'agree as to the conditions upon which a suit to foreclose the mortgage may be brought and to make that agreement a provision of the mortgage.

2. MORTGAGES, § 373*—*effect of provisions in mortgage relative to foreclosure.* Under an agreement contained in a mortgage secured by bonds, requiring that before suit upon such bonds or for the foreclosure of the mortgage might be instituted by bondholders individually it should be necessary that the trustee holding the bonds and mortgage should be notified of the default and that a written request by a majority of the bondholders should be made, and that the trustee should be given a specified time to institute suit, *held* that an action may not, in the absence of fraud, be instituted by a majority of the minority of the original bondholders who did not agree to a plan for the issue of new bonds, and for the substitution of such bonds for old bonds and the giving of a new mortgage, which was to be a prior lien as to all the old bonds and mortgage, and which was agreed to by ninety per cent. of the holders of the old bonds, where there was no intention upon the part of such majority bondholders that their original bonds should be cancelled until all the bonds of the original issue had been deposited with the trustee under the new agreement especially when such an agreement for a new loan was made to prevent financial disaster to the corporation.

3. BONDS,—*when not considered cancelled.* The bonds of the majority of the original bondholders of a corporation who, with the intention of saving the corporation from financial disaster, and without fraud, in an agreement for a new loan by the giving of a new mortgage and bonds which were to be a prior lien over the first issue, cannot be considered as cancelled by depositing them with the trustee under the new agreement where the mortgage, which was a part of the agreement provided that bonds of the former issue should be held by the trustee in trust for the owners and holders thereof, depositing the same with the trustee in trust

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic. and section number.

for the holders thereof, as against all bonds of the former issue not deposited with the trustee, and part of the original issue, was still outstanding.

4. TRIAL, § 6*—*when causes should be consolidated.* There should be a consolidation of cases where one suit is brought by a majority of a minority of the original bondholders of a corporation who did not agree with a plan of the majority for a new loan, and the giving of a new mortgage and bonds which were to be a prior lien to the old mortgage and bonds, for a foreclosure of the original mortgage, and another suit is brought by the trustee at the written request of the holders of the balance of the bonds who represented the majority of the holders of the old and new issue to foreclose both mortgages, the original mortgage providing that suit might be brought by the trustee upon the written request of the majority of the bondholders, and then by such majority upon his refusal to act after a specified time.

Appeal from the Circuit Court of St. Clair county; the Hon. GEORGE A. CROW, Judge, presiding. Heard in this court at the October term, 1914. Reversed and remanded with directions. Opinion filed May 1, 1915. Rehearing denied July 7, 1915. *Certiorari* denied by Supreme Court (making opinion final).

RICHARD L. GOODE, A. H. BAER, KRAMER, KRAMER & CAMPBELL and R. W. ROPIEQUET, for appellants.

JAMISON & THOMAS and TURNER & HOLDER, for appellees.

MR. JUSTICE HIGBEE delivered the opinion of the court.

On October 2, 1905, the Southern Coal & Mining Company, an Illinois corporation engaged in operating large mining properties owned by it in St. Clair and Clinton counties, Illinois, issued bonds to the amount of $1,100,000, bearing interest at the rate of five per cent. per annum, payable semi-annually from date and evidenced by coupons attached to said bonds. The bonds were payable October 1, 1930, and to secure the payment of the same the company executed a mortgage on its properties to the Mercantile Trust Company as trustee, a Missouri corporation, with its

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

office in St. Louis. This mortgage provided, among other things, that the mortgagor should provide a sinking fund to pay off said bonds and for that purpose should, on the first day of September, 1907, and annually thereafter, pay a stipulated sum to the said trustee and also the manner in which said sinking fund should be used in paying off the bonds. It further provided that if any interest on said bonds should be in default of payment for six months after written demand therefor, or the stipulated amounts should not be paid for said sinking fund for a period of three successive years, then and in such case all of said bonds, principal and accrued interest should become due and payable upon a written declaration of a majority of the owners in amount of the bonds outstanding being filed with said trustee; that upon such default in interest or sinking fund the trustee upon the written request of such a majority should have the right to proceed in any court of competent jurisdiction to foreclose the mortgage for the benefit of the bondholders, and that such proceeding should at all times be subject to the direction and control of such a majority of said bondholders; that no bondholder or holders should have a right to institute any suit or proceedings at law or in equity upon said bonds or coupons or for the foreclosure of the mortgage or invoke any other remedy without first giving notice in writing to the trustee of the fact that default had occurred and continued as stated in the mortgage, nor unless a majority of the bondholders, in amount, should make a request in writing to the trustee and give him a reasonable opportunity to exercise the powers granted in the mortgage, nor unless the trustee for thirty days, after the request in writing, had failed to institute said suit. Such notice and request are declared in the mortgage to be conditions precedent to the execution, except by the trustee, of the powers and trust of the mortgage or to any remedy

under the mortgage or upon the bonds and coupons. Interest was paid on the bonds and the sinking fund provided for until 1907, when on account of depression in financial matters there was a default both in the interest and in the provisions to be made for the sinking fund. This condition and the financial depression continued during the years 1908 and 1909, so that the mortgagor was not only unable to pay the interest provided for the sinking fund but its officers also had to borrow money to operate the mines. To protect the officers on said loans, the bondholders holding approximately three-fourths of the amount of bonds secured by said mortgage signed an agreement that the indebtedness represented by such borrowed money should be a prior lien on said property to their mortgage bonds. The additional indebtedness so incurred, having matured, it was decided by the officers of the mining company that some other way of raising money to pay off such indebtedness and operate the property should be devised. With this in view, notices were sent out and, in compliance therewith, stockholders holding a majority of the stock met at the company's office and a committee appointed by them submitted a plan for a new bond issue of $1,500,000 on the property of the company, bearing interest at the rate of five per cent. per annum, maturing in 1939, $400,000 of said amount to be preferred and to be used to pay the current indebtedness and to raise such amounts as should be necessary to keep the properties in operation, and the remaining $1,100,000 of common bonds to be exchanged for the bonds issued October 2, 1905. This report and the recommendations of the committee were adopted by the stockholders attending said meeting and a resolution was passed, authorizing the company to issue such bonds for said amount and afterwards, in pursuance of this resolution, the company did on the first day of October, 1909, issue said bonds for the sum of

$1,500,000 and execute a mortgage on all its property to the Mercantile Trust Company, as trustee, to secure the payment of the same. It was realized by the parties in interest that it would be impossible to get an immediate exchange of the entire issue of $1,100,000 of the issue of October 2, 1905, for a like amount of the new issue of common bonds; and to protect those who did make the exchange and also permit the early use of the $400,000 preferred bonds, it was provided in the new mortgage as follows:

"Fifty-fourth. Inasmuch as the common bonds herein mentioned are to be issued for the purpose of refunding the former bond issue of said coal company of October 1st, 1905, and the due and unpaid coupons and interest thereon, and it is not probable that all of the owners and holders of the bonds of said former issue will be located and their assent obtained to deposit their holdings of said former bond issue with the trustee in exchange for said common bonds as herein provided within a reasonable length of time; therefore, whenever the owners of 90 per cent. in amount of the outstanding bonds of said former issue shall deposit their bonds, coupons and interest notes with the trustee for exchange for said common bonds, then the trustee shall proceed to authenticate and deliver all of the said preferred bonds to the coal company to be used as herein provided, and shall authenticate and deliver said common bonds as herein provided to the owners of bonds and due and unpaid interest coupons thereon so deposited with the trustee, as provided in this mortgage, and the said bonds of said former issue and due and unpaid coupons and interest thereon and notes given for interest due and unpaid on said bonds shall be held by the trustee in trust for the owners and holders thereof depositing the same with the trustee as against all of the bonds of said former issue and due and unpaid coupons and interest thereon not deposited with the trustee, and the bonds, due and unpaid coupons, and interest on said

former bond issue so held by the trustee shall be subject to said preferred bonds herein mentioned, and said preferred bonds shall be a prior lien on the property hereby mortgaged as to all of the bonds of said former issue, due and unpaid coupons, and due and unpaid interest thereon so held by the trustee in trust, and the trustee shall hold said former bonds, coupons and notes so exchanged for the benefit of the owner or owners of the common bonds and coupons exchanged therefor respectively, and a transfer or assignment of any of said common bonds and coupons shall operate as and be a transfer and assignment of all right, title and interest of the owner of said common bonds and coupons in and to the bonds, coupons and notes held by the trustee, and for which said common bonds and coupons were exchanged. The trustee shall hold all of said common bonds of this issue not used in the exchange as aforesaid for the purpose of exchanging them for the bonds of the former issue, the due and unpaid coupons and interest due thereon, whenever the same shall be presented for exchange as herein provided. Whenever all of the bonds of the former issue are so exchanged by the trustee for the common bonds of this issue, then the trustee shall release and satisfy the former mortgage of October 1st, 1905, securing the bond issue of that date, and any of the common bonds then remaining in the hands of the trustee shall be cancelled by the trustee as herein provided."

To carry out the provisions of said section 54, the bondholders holding more than ninety per cent. of the amount of bonds of the issue of October 2, 1905, signed an agreement which was called the "ninety per cent. agreement," consenting that when ninety per cent. of the amount of the bonds issued were deposited with the trustee, he might deliver bonds for $400,000 to the coal company and exchange the bonds of the first issue for common bonds of the second issue as pro-

vided in said section 54, and also that the $400,000 of
preferred bonds should be a prior lien upon the prop-
erty of the company to their interest in the bonds of
the first issue held by the trustee as so provided; also
that said former coupons and notes given for unpaid
coupons be held in trust as was also provided in said
section 54. Subsequently $400,000 of preferred bonds
were authenticated and delivered to the coal company
by the trustee which deposited the same with the
Mechanics' American National Bank as collateral to
secure indebtedness due it, and also to secure the pay-
ment of funds procured to pay the operating ex-
penses of the company. Since the deposit of ninety
per cent. of the bonds of the first issue with the
trustee, he has held them uncancelled for the benefit
of those taking the common bonds in exchange there-
for. In January, 1911, L. D. Turner representing the
Belleville Savings Bank, of which he was president
and some private individuals who held certain of the
bonds of the first issue not deposited with the trustee,
and who had not joined in the agreement to carry out
the provisions of said section 54 in the new mortgage,
called at the office of the trustee and made inquiries in
regard to the payment of interest on the bonds held
by them and the condition of the sinking fund. There
was a general conversation between Judge Goode,
general counsel for the trustee, and Mr. Turner in
regard to the matters of inquiry above mentioned, and
Mr. Turner testified upon the trial that Judge Goode
told him that he agreed ''that the Trust Company is
in a position that they cannot act, but you can.''
Judge Goode in his testimony stated that he had no
recollection of making any such statement, but that if
he did make such a remark his meaning was that the
trustee could not act until requested to do so but that
Mr. Turner was in a position to take steps towards
presenting the request, as provided by the mortgage.
It is not contended that any written request was made
on the trustee by Mr. Turner or those he represented

to foreclose the mortgage. Shortly following this, the savings bank and other parties, holding some $14,000 of the unexchanged bonds of the first issue, brought a suit, which is known as "No. 3048," to foreclose the first mortgage. A motion to dismiss this bill was denied and the bill was later amended. As it was amended the bill alleged that the company had mismanaged the property; that judgment had been obtained against it on past due coupons; that complainants had demanded their interest and made demand in writing on the trustee to take steps, or join with complainants to take steps, to declare the whole of the original mortgage indebtedness, principal as well as interest, due, and to foreclose said first mortgage, but that they were informed by the trustee that by accepting the trust under the second mortgage it was so bound by the provisions of said mortgage that it could not take the steps required but that complainants could do so on their own behalf.

It was the theory of the bill and the court was asked to hold that the bonds deposited under the ninety per cent, agreement in exchange for the common bonds were thereby cancelled, and that the bonds of the first issue not so deposited were a prior lien on all of the property of the company covered by the first mortgage. A demurrer to the amended bill was overruled, an answer and replication filed and the case referred to the master in chancery to take the proof. Bondholders holding about $53,000 of the unexchanged bonds of the first issue and who had not signed the ninety per cent. agreement deposited their bonds with the master in chancery and made proof of the same. While the case was still pending before the master in chancery, a meeting was held by the bondholders who had signed the ninety per cent. agreement, and a committee appointed to represent them. The bondholders owning a majority of the amount of the first issue and of the common bonds of the second issue

served a written request on the trustee to declare the entire debt of the first issue of bonds and to proceed to foreclose the mortgage. In compliance with this request the trustee in connection with the committee of bondholders filed a bill to foreclose such mortgage, the proceedings being known here as "No. 4006." This bill set out the facts leading up to the issuing of the second mortgage and the common and preferred bonds secured thereby, the provisions of section 54 of said mortgage, the signing of the ninety per cent. agreement and the deposit of ninety per cent. of the amount of the original issue with said trustee, in accordance with said agreement and said section 54.

The prayer of the bill was that an accounting be taken of the debt due the Mechanics' American National Bank, for which the preferred bonds were pledged as security; that in case a foreclosure and sale of the premises should produce enough money to pay the debt in full; that out of the sum received the holders of those bonds who did not join in the ninety per cent. agreement and deposit their bonds with the trustee should first be paid in full; that out of the remainder the amount due the Mechanics' American National Bank, which held the $400,000 preferred bonds as collateral, be paid in full and that the remainder should be distributed among the bondholders who signed the ninety per cent. agreement and deposited their bonds with the trustee in exchange for the common bonds; but in case there was not sufficient to pay the whole debt, the bondholders not signing the agreement and depositing their bonds with the trustee should be paid their pro rata share of the proceeds of sale, the same as if all the first issue was in the hands of the bondholders and the second issue had never been issued, and that out of the remainder, the debt due the Mechanics' American National Bank should be paid and the balance, if any, be pro rated among the bondholders signing the ninety per cent. agreement.

After this suit was filed a motion was made by the Mercantile Trust Company, and later by all the complainants in the second bill, to consolidate the two cases and that the trustee be given full charge and control of the same. This motion was denied by the court, but the decree contained the following reference thereto after reciting the denial of the motion: "Except that it is the order and decree of the court that for the purpose of this decree and for the purpose of defining the respective rights of the parties in said cause and to that extent the consolidation of said causes takes place." And it was also further ordered that said cases be consolidated for the purpose of appealing from the decree entered therein. Separate reports were made by the master in chancery in the two cases, to which objections were filed with the master which, being overruled, were filed with the court as exceptions and they having also been overruled. A single decree was entered by the court covering its findings as to both cases.

The master in his report found the facts showing the history of the various transactions relative to the case substantially as above set forth. He also found that there was no evidence of mismanagement of the affairs of the company as was alleged in the bill; that there was no provision in the second mortgage, by which the bonds of the first issue held in trust by the trustee and for which exchange had been made, could be returned to the holders of the bonds exchanged; that the exchange of bonds was a bona fide exchange and the holders of bonds of the second issue could not have the first issue returned to them except by the unanimous consent of all the holders of the bonds of the second issue, the trustee and the Southern Coal and Mining Company. He further found that complainants in No. 3048 did not give a notice in writing signed by a majority of all the outstanding bondholders of the issue to the trustee to foreclose the mort-

gage, and that no such notice in writing was given signed by a majority of the owners of the $63,000 in bonds not exchanged; that the trusteeship of the trustee in the second mortgage was inconsistent with that of the first and therefore it was not necessary for a majority of the owners of the $63,000 of bonds of the first issue outstanding to give notice in writing to the trustee before bringing suit; that the complainants in the first bill, No. 3048, who are owners of bonds to the amount of $63,000, who did not sign the ninety per cent. agreement and did not deposit their bonds with the trustee, have a prior lien to all other holders of the issue of 1905 and are entitled to be paid in full before any of the other bondholders who did deposit their bonds with the trustee are paid anything. He further found the amount due on all the bonds of the first issue and recommended a decree as prayed for in the first bill. The court in addition to overruling the exceptions to the master's report found that all the material allegations in the bill as amended in No. 3048 were substantially true and the equities were with the complainants therein; that prior to the filing of the first bill, representatives of the trustee had stated to the party representing the complainants that it was so situated it could not act upon their request to foreclose the mortgage of 1905; that by accepting the trust under the mortgage of 1909, the trustee assumed a position which in law prohibited it from acting as an impartial trustee in the mortgage of 1905 as to the holders of those bonds of the first issue who did not consent to exchange them for the common bonds of the second issue. The court further found that there was due the complainants in No. 3048 on their bonds of the first issue with accumulated interest on the date named, the sum of $65,648.82, and decreed that the Southern Coal & Mining Company pay this amount and that in default thereof, the premises be sold and that out of the proceeds such bonds be paid before

anything should be paid on the other bonds of the issue of 1905. And it was further decreed that the master in chancery out of the proceeds of sale, pay the complainants in No. 3048 the amount due on their bonds and that he bring the surplus money arising from the sale into court for the further order of the court. From this decree so entered, the defendants in cause No. 3048 and the complainants in cause No. 4006 prayed and perfected an appeal to this court and, as above stated, the court ordered that for the purposes of such appeal the two causes were consolidated and both of said causes might be appealed by the giving of the bond therein provided for.

It is contended by appellants that the findings of the court were not sustained by the evidence; that the decree is inequitable and not sustained by the law and the evidence; that the court erred in not sustaining the motion to dismiss the bill in suit No. 3048; in not granting the motion to consolidate said suits and permit the trustee to take charge and control of the same when consolidated, and in holding that the bonds held by the complainants in No. 3048 and other bondholders who did not sign the ninety per cent. agreement, and did not deposit their bonds with the trustee, are the only outstanding bonds of the issue of 1905 and entitled to be treated as a prior lien upon all the mortgaged property; and that the bonds of the issue of 1905 deposited with the trustee under the ninety per cent. agreement and under section 54 of the mortgage were in effect cancelled. The first question brought to the attention of the court is as to the rights of complainants in suit No. 3048 to maintain their suit, but this question could be of no practical importance if the motion to consolidate the two suits had been sustained. The proofs show that complainants in that suit did not fully comply with section 11 of the mortgage of 1905, which provided that no holder or holders of any bond or bonds or coupons secured by the

mortgage should have the right to institute proceedings to foreclose the mortgage, or for any other remedy upon said bonds under the mortgage, without first giving notice in writing to the trustee of the fact that default had occurred, nor unless the holders of a majority in amount of the bonds outstanding should make a request in writing to the trustee, and afford such trustee a reasonable opportunity to exercise the powers granted, nor unless the trustee should, after thirty days after such request in writing, fail to do so. But the contention of appellees is that the bonds of the first issue deposited with the trustee, by virtue of provision No. 54 of the new mortgage and the ninety per cent. agreement made in connection therewith, were cancelled and that substantially all of the bonds of the first issue remaining in force were those held by appellees; that appellees or a majority of them acting through Mr. Turner, the president of the Belleville Savings Bank, had in effect made a demand on the trustee to foreclose the mortgage and that the trustee had refused to do so, and that therefore, in substance, the terms of such section 11 of the first mortgage had been complied with before the suit was instituted. It therefore becomes of interest to determine here what the effect of depositing bonds under the first issue with the trustee under section 54 of the mortgage and the ninety per cent. agreement really was, with a view of ascertaining whether such action in effect cancelled the bonds so deposited, and this appears to be the main question to be decided in the case.

We find upon an examination of the provisions of section 54 of the second mortgage and of the ninety per cent. agreement that the same did not provide for a cancellation of the bonds to be deposited until all of the bonds of the first issue had been so exchanged, but on the contrary the provision of the mortgage, which was made a part of the ninety per cent. agree-

ment, expressly provides that ''said bonds of said former issue and due and unpaid coupons and interest thereon, and notes given for interest due and unpaid on said bonds, shall be held by the trustee in trust for the owners and holders thereof, depositing the same with the trustee as against all of the bonds of said former issue, and due and unpaid coupons and interest thereon not deposited with the trustee.'' It would thus appear that said bonds were not to be cancelled until the whole issue had been deposited with the trustee, but were to be held for the protection of those depositing. The language used does not appear to indicate that there was any intention on the part of those entering into the agreement that those depositing the bonds should surrender their right to an equal interest in the mortgaged property, according to the amount of bonds deposited, with the bondholders not entering into such agreement. It is apparent that the coal company was in distress and its property and the interests of the bondholders in jeopardy. To save the property and the business not only for themselves, but equally for all, bondholders holding approximately $1,045,000 of the bonds of the first issue entered in the new undertaking. They did nothing to effect the rights of those not joining with them unless it be to strengthen their security. It was an arrangement whereby those entering into it might undertake additional obligations and suffer additional loss, but in any event those remaining out could not be injured. It is true that certain of the bondholders had incurred personal obligations to some extent to protect the interests of all alike. It is charged in the bill that the directors and officials of said mining company and said trustee and said Mechanics' American National Bank were combining and confederating together for the purpose of defeating the just claims of complainants, and were attempting to and were destroying and rendering worthless their security, but

the court while finding generally with the complainants in bill No. 3048, by its approval of the master's report specially found that there was no evidence of mismanagement on the part of the officers of the company, and we have found no proof in the record to establish the claim that the parties above mentioned had confederated to do or were doing anything to further their own interests at the expense of appellee and those bondholders similarly situated. Under these circumstances we feel that the principles of equity impel us to hold that the bonds of the first issue deposited with the trustee, under the ninety per cent. agreement and according to the provisions of section 54 of the new mortgage, are not to be considered as cancelled, but that so far as their relations to the other bonds not deposited are concerned, they must be considered of like force and effect. Therefore, so far as appellees are concerned, all the bonds of the first issue were in force, and before the trustee could be required to bring the suit to foreclose the mortgage securing the same, the holders of such bonds were required to comply with section 11 of the first mortgage above referred to in the matter of notice to the trustee. Cook on Stock and Stockholders and Corporation Law (3rd Ed.) vol. 2, sec. 826. Thompson on Corporations (2nd Ed.) vol. 3, secs. 2636, 2637. Holders of bonds secured by mortgage have a right to agree as to the conditions upon which a suit to foreclose the mortgage may be brought and to make that agreement a provision of the mortgage so that persons buying the bonds may know what their rights are in that regard. *Venner v. Chicago City Ry. Co.,* 258 Ill. 523; *Belleville Sav. Bank v. Southern Coal & Mining Co.* 173 Ill. App. 250. We are therefore of opinion that the holders of the bonds not deposited with the trustee under the ninety per cent. agreement and represented by appellees were not empowered to compel the trustee to bring suit to foreclose the mortgage, nor do we

think that such holders in the absence of fraud, as is the case here, would be authorized to bring suit in foreclosure under such circumstances in their own names.

In the proceedings which resulted in the decree from which the appeal has been taken to this court, there were two suits pending, one by the holders of the bonds issued under the first mortgage, which had not been deposited with the trustee under the ninety per cent. agreement and which amounted to approximately $55,000. The other was brought by the trustee at the written request of the holders of the balance of said bonds who represented a majority of the bondholders of the old and the new issue to foreclose both mortgages. After this bill was filed, that part of it which asked for the foreclosure of the first mortgage must be treated as being for the benefit of all holders of bonds under that mortgage, and the court should have sustained the motion made by appellant to consolidate the two cases. It is true that the trustee occupied a position which was not favorable to the relief asked for by appellees, and for that reason we think that while the two cases should have been consolidated, the bill of appellees should not after that time have been dismissed, but that it should be permitted to stand in the nature of a cross-bill for the purpose of setting forth the claims of appellees and to give them the opportunity, if possible, of establishing their rights as therein set forth. As a matter of fact, while refusing to permit the two cases to be consolidated generally, the court did consolidate them for the purposes of the decree and the appeal, which in part accomplished what was proper to be done under the circumstances. In conformity with our views as above expressed, the decree will be reversed and the cause remanded with directions to the trial court to order said causes to be consolidated and to enter a decree foreclosing the first mortgage as prayed for in the

bill in No. 4006, and said decree should further provide that in case of a sale to satisfy such indebtedness, there should be paid out of the proceeds: First, the costs of suit; next, there should be paid to the holders of bonds not deposited under the ninety per cent. agreement, their pro rata share of said balance, based on the pro rata division of said balance among all the bonds secured by the first mortgage, said payment not to be in excess of the amount due on said bonds including interest; then there should be paid the amount due the Mechanics' American National Bank, for which the $400,000 of preferred bonds are held as security; and what remains should be paid pro rata among the bondholders who deposited their bonds with the trustee under the ninety per cent. agreement. The decree should also provide that when this is done, all of the bonds issued under the second mortgage should be surrendered and cancelled.

*Decree reversed and cause remanded with directions.*